PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 09-4353

————————

LAWRENCE V. RAY,

Appellant,

v.

TOWNSHIP OF WARREN; CAROLANN GARAFOLA,
Mayor, in her official capacity; WARREN TOWNSHIP
POLICE DEPARTMENT; WILLIAM STAHL, Chief of
Police, in his official capacity; RUSSELL W. LEFFORT,
Lieutenant; ANGELO PAOLELLA; JOSEPH E. COHEN,
Officer; DONALD V. CALABRESE, Officer; LARRY
FRANK, Officer; RAE S. QUAST, Officer, in their individual
capacities and official capacities as Police
Officers in the Township of Warren;
RICHARD M. SASSO, Judge of Warren Township
Municipal Court, in his official capacity,

————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-07-cv-02812)
District Judge:  Hon. Joel A. Pisano

————————————

Argued
October 12, 2010

Before:   SCIRICA, FUENTES and JORDAN, *Circuit
Judges*.

(Filed: November 23, 2010)

————————————

Michael V. Gilberti
Epstein & Gilberti
21 East Front Street - #210
Red Bank, NJ 07701

Paul H. Levinson   [ARGUED]
McLaughlin & Stern
260 Madison Avenue
New York, NY 10016
        *Counsel for Appellant*

Juan C. Fernandez   [ARGUED]
Dawn M. Sullivan
O'Toole Fernandez Weiner Van Lieu
60 Pompton Avenue
Verone, NJ   07044
        *Counsel for Appellees*

---

## OPINION OF THE COURT

---

JORDAN, *Circuit Judge*.

Lawrence V. Ray appeals from an order of the United States District Court for the District of New Jersey granting summary judgment, based on qualified immunity, to several officers of the Warren Township Police Department on his Fourth Amendment claim under 42 U.S.C. § 1983.  Ray claims that the officers violated his Fourth Amendment right against unlawful searches when they entered his home while investigating concerns expressed by his estranged wife about the Rays' daughter.  For the following reasons, we will affirm.

## I.    Background

### A.    *Factual Background*

On the evening of June 17, 2005, Theresa Ray[1] went to her husband's home in Warren, New Jersey, to pick up their youngest daughter for court-ordered visitation.[2]  After ringing the doorbell, Ms. Ray observed a man whom she believed to be her husband moving about in the home.  Ms. Ray continued to ring the doorbell and knock on the door for several minutes in an attempt to alert the man to her presence.  After receiving no response, she called the police.

Sergeant Angelo Paolella and Officers Donald Calabrese and Larry Frank responded to the call and were soon joined by Officer Joseph Cohen (collectively, the "responding officers"). Some of the responding officers had been called by the Rays in the past to deal with domestic problems and were aware of the "acrimonious nature of the Ray's [sic] divorce proceedings and child custody disputes at the home." (App. at 114, 117.) On the evening in question, Ms. Ray informed the responding officers that she had arrived at the home to pick up her child for visitation pursuant to a final restraining order that, in part,

---

[1]We will refer to Lawrence Ray as "Ray" and his wife as "Ms. Ray."

[2]While the record is not clear on the point, it appears from the briefing that the Rays' daughter was four or five years old at the time of these events.

addressed visitation rights.[3]  She informed the officers that she had seen someone inside the home who was not responding to the door, whom she believed to be her husband and whom she assumed had custody of the child at the time.[4]  Ms. Ray was visibly upset and told the officers that she was concerned for the well-being of her daughter.[5]  The officers shared her concern.

---

[3]Ray asserts that it is not clear whether his wife was actually entitled to visitation on that evening and complains that the officers never confirmed that she had a visitation order. However, the record reflects that Ms. Ray showed Officer Calabrese a copy of the order and that Officer Paollela confirmed through dispatch that there was a restraining order in effect.  (App. at 39, 75, 114.)  Regardless of whether Ms. Ray was legally entitled to visitation at the time – a fact that the District Court correctly concluded was immaterial – there is no dispute that the officers were aware of ongoing custody issues with the couple and that they had been informed that evening that Ms. Ray had arrived at the house to pick up her daughter for visitation.

[4]The record does not indicate that Ms. Ray saw her daughter while she was at the door; however, some of the officers testified that they had been informed that the child was in the house.

[5]Ray argues that Ms. Ray did not have any concern for the little girl.  He relies on the fact that, at her deposition, when asked about the basis for her concern, Ms. Ray responded, "My husband's acting like completely nuts, not giving me my daughter for visitation ... and I can tell you I did not see her

They circled the perimeter of the house, knocked on the doors and windows, and called Ray's home telephone, but received no response. That heightened the officers' apprehensions because on other occasions when police had been called to the residence, Ray had always responded and turned over his daughter to his wife.

In light of the circumstances, Officer Calabrese, at Sergeant Paolella's instruction, contacted a municipal court judge for guidance as to whether the officers could "go in the house to look" for the child.[6] (App. at 70.) Exactly what was discussed during the phone call is not clear. Paolella and Calabrese testified that they only sought approval to enter the home out of concern for the Rays' daughter and that the judge gave them such authorization. Both Paolella and Calabrese testified that they did not regard the call to the judge as a request for a warrant of any kind. In contrast, the judge understood the

since June first. He is increasing his alienation of my children. He's already turned ... one daughter against me ... ." (App. at 93). Regardless of Ms. Ray's actual motivations for calling the police, the record is clear that the officers on the scene were genuinely concerned for the child's well-being and that they perceived Ms. Ray was as well.

[6]The officers called into headquarters and either someone provided Calabrese the contact information or someone there contacted the judge, who called Calabrese on his cell phone. It appears that Officer Calabrese failed to follow department protocol when he called the judge rather than Lieutenant Russell Leffert, his immediate supervisor, or the prosecutor's office.

officers to be asking for an arrest warrant based on Ray's violation of the terms of the restraining order, though he indicated that Officer Calabrese "was afraid for the safety of the kids." (App. at 82). Based on the call, the judge issued an arrest warrant for Ray, which was later voided. Regardless of the ambiguity regarding the call to the judge, the record reflects that the primary motivation of the officers on the scene was to enter the home so that they could check on the child.[7]

The officers entered Ray's home through an unlocked door that was ajar, but obstructed by a piece of lumber meant to keep the door secured.[8] The lumber was moved aside with a "slim jim," a device used to gain access to a locked vehicle. Upon entering the home, the officers encountered Ray's father, who explained to the officers that he had been sleeping and that his son was not at home. After quickly looking through the home, the officers found neither Ray nor his daughter. The event was captured on video by cameras installed in Ray's home. Shortly after the incident, the officers were informed that

---

[7]Officer Calabrese initially filed a handwritten police report including a reference to the phone call made to the judge prior to entry into the home. That report was later typed and the reference to the phone call was omitted at the request of Lieutenant Leffert.

[8]During the call to the judge, Calabrese described the door as "open." The record clearly indicates that the door could not be closed – hence the use of the lumber as an improvised lock since the lock on the door was of no practical use. (App. at 88, 108.)

someone had made contact with Ray and that he was bringing the child to police headquarters.

### B.    *Procedural History*

Ray filed a complaint asserting a claim under § 1983 and several state law claims based upon the allegedly unconstitutional search of his home.  Ray named as defendants the responding officers and Lieutenant Leffert in their individual and official capacities, the Township of Warren, the Township of Warren Police Department, and Chief of Police William Stahl in his official capacity, all of whom filed a joint motion for summary judgment.[9]  In that motion, the responding officers and Leffert ("Appellees") asserted that they were entitled to qualified immunity.

The District Court agreed and, based upon qualified immunity, granted summary judgment to the Appellees on Ray's § 1983 claim.[10]  The District Court also dismissed Ray's claims

---

[9]Ray named three other defendants in his amended complaint, all of whom were dismissed from the matter before the remaining defendants filed for summary judgment.

[10]Appellee Officer Larry Frank was inadvertently omitted from the motion as a movant, thus the District Court did not include Officer Frank in its opinion and order. However, the court amended its order granting summary judgment to include Officer Frank, with the agreement of the parties.  Appellees also moved for summary judgment based on New Jersey's Tort Claims Act.  The District Court granted summary judgment on

8

against the officers, Lieutenant Leffert, and Chief Stahl in their official capacities, as well as his claim against the Warren Township Police Department, because all of those claims were redundant of the claim against the Township. Thereafter, the parties stipulated to the dismissal of the claims against the Township. Ray then filed this timely appeal.

## II.    Discussion[11]

We exercise *de novo* review over the District Court's grant of summary judgment. *Kopec v. Tate*, 361 F.3d 772, 775 (3d Cir. 2004). An order granting summary judgment is appropriate when the evidence reveals there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing the record, we are required to view the facts and draw inferences in the light most favorable to the nonmoving party. *Kopec*, 361 F.3d at 775.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (internal

---

all of Ray's state law claims, and that decision is not before us on appeal.

[11]The District Court had jurisdiction over this action based upon 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

quotations omitted). Thus, if a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Supreme Court has established a two-part analysis that governs whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first question in the *Saucier* analysis asks whether the official's conduct violated a constitutional or federal right. *Id.* This is not a question of immunity, but whether there is any wrong to address. *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007). The second question asks whether the right at issue was "clearly established." *Saucier*, 533 U.S. at 201. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If "the officer made a reasonable mistake about the legal constraints on his actions," then qualified immunity should protect him from suit. *Curley*, 499 F.3d at 207. In considering that question, we judge the officer's actions from the perspective of an objectively reasonable law enforcement officer under the circumstances, and we endeavor to avoid hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Supreme Court has held that the questions in the *Saucier* analysis need not be addressed in sequence. *Pearson*, 129 S.Ct. 818. Instead, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified

10

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

The constitutional right at issue in this appeal is Ray's right under the Fourth Amendment to be free from an unreasonable search of his home. U.S. CONST. amend. IV. Searches of a home without a warrant are presumptively unreasonable, though the warrant requirement is subject to carefully defined exceptions. *See Illinois v. Rodriguez*, 497 U.S. 177, 191 (1990). Since the responding officers did not have a warrant to search Ray's home, the question of whether Ray's rights have been violated rests on whether an exception to the warrant requirement applies. While one might have thought the officers would claim that their search was justified by exigent circumstances, which is a well-recognized exception to the warrant requirement, they do not. To justify their actions, they instead point to what has come to be called the "community caretaking" exception to the Fourth Amendment's warrant requirement. Ray, of course, contends that no such exception applies here.

The Supreme Court first recognized the community caretaking exception in *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973). In *Cady*, a Chicago police officer named Dombrowski was visiting in Wisconsin and reported to the local police that he had been in an automobile accident. The police picked him up and returned to the scene of the accident. *Id.* at 435-36. Dombrowski had been drinking, appeared intoxicated to the officers, and offered conflicting versions of the accident. *Id.* He informed the local officers that he was a Chicago policeman. *Id.* at 436. The local officers believed that members of the Chicago

11

police force were required to carry a service revolver at all times, so, when no gun was found on Dombrowski's person, an officer checked the front seat and the glove compartment of the wrecked car, but to no avail. *Id.* The effort to find the weapon was motivated by the obligation of the police "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443. The police had the vehicle towed to a privately owned garage, where it was left parked outside. *Id.* at 436. After taking Dombrowski to a local hospital for treatment of injuries he sustained in the accident, one of the Wisconsin officers returned to Dombrowski's car to again try to recover the service revolver, *id.* at 436-37, again pursuant to standard departmental procedure "to protect the public from a weapon's possibly falling into improper hands." *Id.* at 434. Upon opening the trunk, the officer discovered various items that linked Dombrowski to a murder. *Id.* at 437-38.

The Supreme Court held that the search of Dombrowski's vehicle was permissible because it was the result of a police officer's community caretaking function, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441; *see also United States v. Smith*, 522 F.3d 305, 313 (3d Cir. 2008) ("In performing this community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.'" (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 784-85 (1st Cir. 1991))). The Court determined that the search for the gun was

12

reasonable, though its holding was based largely on the constitutional distinction between automobiles and dwellings:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office ... . The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained.

*Id.* at 439, 447-448.

The *Cady* Court recognized that, while some contact between police officers and vehicles will occur because of a possible violation of a criminal statute, much of the contact will be completely unrelated to criminal law enforcement and will occur when officers are acting as community caretakers. *Id.* at 441. The Court expressly distinguished automobile searches from searches of a home, saying that a search of a vehicle may be reasonable "although the result might be the opposite in a search of a home." *Id.* at 440. That distinction recognizes that

13

the sanctity of the home "has been embedded in our tradition since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601 (1980). Indeed, the Supreme Court has emphasized that "[t]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313 (1972).

There is some confusion among the circuits as to whether the community caretaking exception set forth in *Cady* applies to warrantless searches of the home. The majority of circuits have reasoned that the community caretaking doctrine announced in *Cady* is limited to searches of automobiles. The Ninth Circuit, in *United States v. Erickson*, 991 F.2d 529, 533 (9th Cir. 1993), held that *Cady* was based on the distinction made between vehicles and residences and that an officer acting as a community caretaker may only enter a building based on an already acknowledged exception to the warrant requirement, like exigent circumstances. 991 F.2d at 531-32 ("Although it involved a community caretaking function, *Cady* clearly turned on the 'constitutional difference' between searching a house and searching an automobile."). The Seventh Circuit took a similar approach in *United States v. Pichany*, 687 F.2d 204 (7th Cir. 1982), which concerned a warrantless search of a privately owned warehouse. The court held that *Cady* was limited to automobile searches and refused to create a "warehouse exception," even if the officers were acting as community caretakers. *Id.* at 207-09 ("[T]he plain import from the language of the *Cady* decision is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an

14

'investigative,' rather than a 'criminal' function."). Likewise, the Tenth Circuit held that the community caretaking doctrine announced in *Cady* applies only to automobiles. *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994). There the court found that the search of an old manufacturing plant under the auspices of the community caretaking doctrine was unconstitutional because the holding in *Cady* was based on the "constitutional difference" between searches of automobiles and searches of homes or businesses. *Id.*

Some circuits do appear to have relied on the community caretaking exception created in *Cady* to uphold warrantless entries into houses. In *United States v. Quezada*, 448 F.3d 1005 (8th Cir. 2006), the Eighth Circuit held that an officer acting in a community caretaking role may enter a residence when the officer has a reasonable belief that an emergency exists that requires attention. 448 F.3d at 1007-08. The Sixth Circuit took a similar approach in *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996), when it held that two officers' warrantless entry into a home was permissible since they were acting as community caretakers to abate a significant noise nuisance. 98 F.3d at 1509.

Those cases, however, do not simply rely on the community caretaking doctrine established in *Cady*. They instead apply what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role. For example, in *Quezada*, the Eighth Circuit held that the officer had to have a "reasonable belief that an emergency exists requiring his or her attention" for the community caretaking doctrine to apply to a warrantless search of a home. 448 F.3d at 1007

15

(emphasis added).  And in *Rohrig*, the Sixth Circuit recognized that some situations addressed by officers within their community caretaking functions, though not within the scope of traditional law enforcement, can still present important government interests that may rise to the level of traditionally recognized "exigent circumstances."  98 F.3d at 1521-22.  In fact, the Sixth Circuit itself has questioned whether *Rohrig* created a new community caretaking exception to the warrant requirement for entry into a home.  *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("[D]espite references to the doctrine of *Rohrig*, we doubt that community caretaking will generally justify warrantless entries into private homes.").[12]

We agree with the conclusion of the Seventh, Ninth, and Tenth Circuits on this issue, and interpret the Supreme Court's decision in *Cady* as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes.  The community caretaking doctrine cannot be used to justify warrantless searches of a home.  Whether that exception can ever apply outside the context of an automobile search, we need not now decide.  It is enough to say that, in the context of a search of a home, it does not override the warrant requirement of the Fourth Amendment or the carefully crafted and well-recognized exceptions to that requirement.

---

[12] While the Eleventh Circuit has cited *Rohrig* as one case that "ha[s] recognized that police officers may enter a house without a warrant based on what could be characterized as their community caretaking functions," *United States v. McGough*, 412 F.3d 1232, 1238 (11th Cir. 2005), we defer to the Sixth Circuit's interpretation of its own precedent.

Those exceptions include exigent circumstances, which may involve circumstances beyond those confronted by police in a criminal investigatory context. *See United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) ("Examples of exigent circumstances include, *but are not limited to*, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.") (emphasis added). Circumstances involving the protection of a child's welfare, even absent suspicions of criminal activity, may present an exigency permitting warrantless entry, but only if the officer reasonably believes that "someone is in *imminent* danger." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). Under the circumstances of this case, it is debatable whether the officers confronted exigent circumstances.[13]

Regardless of whether there were exigent circumstances in this case, however, the responding officers are entitled to qualified immunity. "The qualified immunity question is whether the officer was reasonably mistaken about the state of the law." *Curley v. Klem*, 499 F.3d 199, 214 (3d Cir. 2007). There is no dispute that at the time of the officers' actions in this case, two Circuits had arguably extended the community caretaking doctrine to warrantless entries into homes. *See*

---

[13]We note that, on the surface at least, the facts of this case raise the question of whether a valid entry may have been made under the exigent circumstances doctrine, since the belief of the officers on the scene was that a four or five year-old child was left alone in a home with an unresponsive adult who had always previously promptly responded to police contacts and who was involved in a bitter custody dispute over the child.

17

*Quezada*, 448 F.3d at 1007; *Rohrig*, 98 F.3d at 1521-22. Moreover, this Circuit had addressed the issue only in a non-precedential opinion, *Burr v. Hasbrouck Heights*, 131 Fed. Appx. 799 (3d Cir. 2005), one month prior to the officers' actions, and had left unresolved whether a community caretaking exception might justify a warrantless search of a home. Until our decision in this case, the question of whether the community caretaking doctrine could justify a warrantless entry into a home was unanswered in our Circuit. Given the conflicting precedents on this issue from other Circuits, we cannot say it would have been apparent to an objectively reasonable officer that entry into Ray's home on June 17, 2005 was a violation of the law.

That conclusion is amply supported by the record. The officers were aware of the contentious circumstances underlying the Rays' divorce and custody proceedings between Ray and his wife. Ms. Ray was visibly concerned and had informed the officers she was at the residence to pick up her daughter for scheduled visitation and that her husband was in the home but failing to respond. On previous occasions, Mr. Ray had always come to the door and turned over his daughter when the police arrived. It was objectively reasonable for the officers to be concerned for the young child and to believe that entry was appropriate under the state of the law at that time.

Ray accuses the District Court of indulging in a "skewed" reading of the record (Appellant's Op. Br. at 20); however, it is his own reading of the record that appears to be out of balance. Instead of looking at what the officers were told on the evening in question, he essentially accuses them of taking his wife's side

18

in their marital disputes and implies that they were biased against him. Ray's entire theory depends on an inference that the officers conspired to acquire an invalid arrest warrant from the judge in order to permit them to enter the house. That inference is too far a stretch to survive summary judgment on the record before us.[14] While the police may not have acted

---

[14]In support of his theory, Ray points out that Officer Cohen searched a dresser drawer too small to contain a child, which must have reflected a search "for evidence." (Appellant's Op. Br. at 29.) First, the record does not suggest that the police were searching for evidence. Even if the police were, as Ray contends, "investigating" Ray's failure to make his daughter available for visitation, it would not make sense to open and immediately shut a drawer. Regardless, while Officer Cohen probably should not have opened the drawer at all – a casual and thoughtless act caught by the surveillance camera – that fact cannot be stretched into a material issue on this record.

Additionally, Ray argues that Officer Calabrese's telling the judge that the door was "open," rather than "unlocked," illustrates the officers' acknowledgment that their actions were in violation of the law. That is likewise too far a stretch. The record indicates that the door was "open" in the sense that it was ajar since it could not close entirely. Furthermore, the police department form filled out by Calabrese after the incident lists several options that an officer can circle to indicate method of entry. Calabrese circled "open/unlocked," which suggests that he understood the two words to be essentially interchangeable in this context.

Ray also alleges that Officer Calabrese's failure to follow department protocol when he called Judge Sasso rather than his

ideally in the situation,[15] what is quite clear from the record is that they were trying to do a difficult job in a potentially

immediate supervisor or the prosecutor's office indicates that the officers' actions were not reasonable under the circumstances. It may be that some training or disciplinary steps are warranted to encourage more careful adherence to the chain of command, *see infra* note 15, but that does not mean that the call to the judge reflected a lack of reasonableness in seeking entry to check on the child.

[15]Although the officers acted within the bounds of reasonableness, we cannot say that all of their actions were commendable. Their failure to follow department procedure resulted in the issuance of an invalid warrant, which could have resulted in Ray's unnecessary arrest. That could have been a particularly serious though unintended consequence and perhaps explains why the officers altered the police report. Of course, we do not condone the officers' alteration of the initial police report to remove the reference to the judge. Regardless, even if the officers may have acted inappropriately after the search, that does not mean that the search itself was objectively unreasonable.

We realize that the police must have been frustrated in their dealings with the Rays. The record shows that both Ray and his wife repeatedly and unnecessarily involved the police in their marital disputes. Law enforcement officers do not, of course, have the luxury of not responding to calls for help, even though they may at times be ill-used in domestic dramas like the Rays'. In the future, though, we anticipate that police officers will follow proper procedures in exercising their judgment.

dangerous situation. They were acting out of concern for the well-being of the Rays' young daughter, and, for that reason, we cannot say that they acted unreasonably in mistakenly believing that they were permitted to enter the house pursuant to the unclear boundaries of the community caretaking exception at that time.

Under the circumstances, the officers were not on notice that their conduct was a clear violation of the law, and they acted reasonably in their belief that they could enter Ray's home for the purpose of checking on his daughter. Accordingly, we agree with the District Court that Appellees are entitled to qualified immunity.

## III. Conclusion

For the foregoing reasons, we affirm the District Court's order granting Appellees' motion for summary judgment as to qualified immunity.