267 P.3d 1022 (2011)
165 Wn. App. 525
David FEIS, Appellant,
v.
KING COUNTY SHERIFF'S DEPARTMENT, a division of King County, Deputies Christina Bartlett, Eric Franklin, Abigail Steele, and Kyle McCutchen, and Does 1-5 inclusive, Respondents.
No. 66062-4-I.
Court of Appeals of Washington, Division 1.
December 19, 2011.
*1025 Darryl Parker, Premier Law Group, PLLC, Bellevue, WA, Riley Lovejoy, Attorney at Law, Seattle, WA, for Appellant.
Howard Phillip Schneiderman, Office of the Prosecuting Attorney, Kristofer John Bundy, Seattle, WA, for Respondents.
*1026 DWYER, C.J.
¶ 1 In an action premised upon the alleged violation of a federal constitutional right, qualified immunity protects government officials from civil liability unless the plaintiff proffers evidence tending to establish the violation of a particularized right that was clearly established beyond debate at the time of the alleged violation. Ashcroft v. al-Kidd, ___ U.S. ___, 131 S.Ct. 2074, 2080-83, 179 L.Ed.2d 1149 (2011); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." al-Kidd, 131 S.Ct. at 2085. David Feis filed a lawsuit against the King County Sheriff's Department (Department) and four individual officers in connection with his arrest for assault in the fourth degreedomestic violence and an ensuing entry of his home and seizure of his firearms. Finding that the officers were immune from suit, the trial court dismissed all of Feis's claims on summary judgment.[1] Feis[2] contends that the officers are not immune because their actions violated his clearly established right to be free from unreasonable searches and seizures. The trial court correctly ruled that Feis failed to defeat the officers' assertion of immunity. Accordingly, we affirm.

I
¶ 2 On March 31, 2007, King County Sheriff's deputies responded to a series of 911 calls regarding an incident in Shoreline involving Feis and his step-son, Joshua Petersen. Joshua himself placed one of the calls. He reported that Feis had hit him and requested that police come to the scene. Joshua placed the call while at a church across the street from the house where the incident had occurred. He told the dispatcher that he had just returned home[3] from shopping with his brother when the incident began. Joshua also told the operator that he had run away and that he was worried that Feis might have pursued him. When the operator asked if there were any weapons in the house, Joshua responded that he believed that Feis kept guns.
¶ 3 Minutes later, Hope Feis, Feis's wife, called 911 to report the same altercation between her husband and son and to request that police come to the scene. During this call, the dispatcher asked to speak with Feis. Feis explained that he and Joshua had exchanged insults before Feis was hit in the nose by either Joshua or Edward, Joshua's brother. Feis was unsure whether it was Joshua or Edward who had hit him because Edward had positioned himself between Feis and Joshua as Edward "thought [Feis] was going to pop [Joshua] one." Clerk's Papers (CP) at 30. Feis told the operator that, in response to being hit, he "reached out and barely slapped [Joshua] in the face." CP at 30.
¶ 4 Three officers were dispatched to the scene, having been directed by radio to respond to a domestic violence incident.[4] Sergeant Abigail Steele and Deputy Eric *1027 Franklin arrived at the scene almost simultaneously, where they encountered Feis, Hope, and Edward. Sergeant Steele immediately observed that Hope was "very upset and crying." CP at 82. When the officers questioned Feis and Hope, Feis interrupted and talked over Hope. Consequently, Sergeant Steele asked to speak with Hope privately, but when Hope stood up and began to walk she collapsed and suffered what appeared to be a seizure. The officers summoned an aid unit. Medics treated Hope at the scene.
¶ 5 As Hope was being treated, Deputy Franklin spoke with Feis while Sergeant Steele spoke with Edward. Feis told Deputy Franklin that he was very upset with Joshua, that they had argued but Edward separated them, and that Feis had merely "pushed Joshua's hand away" but had not hit him. CP at 97. Edward told Sergeant Steele that he and Joshua had returned home from shopping to find their parents inside their car parked on the front lawn. Edward reported that he saw Feis move his car toward Joshua, but "didn't think he was trying to run Joshua over." CP at 83. Edward told Sergeant Steele that Joshua and Feis "started getting into it," so Edward stepped between them to "prevent a problem." CP at 83.
¶ 6 After speaking with Edward, Sergeant Steele spoke with Feis. Feis similarly reported that he and Hope were still inside their car parked on the front lawn when Joshua and Edward returned home from shopping. Feis told Sergeant Steele that he and Joshua had "fought, but landed no blows." CP at 83. Sergeant Steele observed that Feis "expressed anger at Joshua," and remembered Feis saying that he was "sick and tired of Joshua not working, not going to school, and costing him money by turning the heat up too high and not getting a job." CP at 83.
¶ 7 Meanwhile, Deputy Kyle McCutchen spoke with Joshua at the nearby church where Joshua was waiting. Joshua told Deputy McCutchen that Feis had assaulted him. Specifically, Joshua reported that he and Edward had arrived home, where their parents were sitting inside of the family car on the front lawn, when the incident began. Joshua explained that Feis became angry because Joshua and Edward had spent money while shopping and that Feis "lunged" the car toward Joshua, almost hitting him. CP at 100. Joshua reported that, after the two exchanged "heated words,"[5] Feis slapped him. CP at 100. Joshua told Deputy McCutchen that he was certain that Feis had attempted to hit him with the car and that he was scared. Thereafter, Deputy McCutchen and Joshua returned to the Feis residence. In his declaration, Deputy McCutchen noted a remarkable size disparity between Joshua, who was very slight, and Feis, who was "extremely large and obese" and over six feet tall. CP at 100.
¶ 8 Now at the Feis residence, Deputy McCutchen relayed Joshua's account to Sergeant Steele before speaking with Hope inside the medic unit. According to Deputy McCutchen, Hope's report of events was "almost identical to Joshua's report," as Hope told Deputy McCutchen that Feis had "lunged" his car at Joshua, got out of the car, and slapped Joshua. CP at 101. Hope confirmed her report in a signed statement prepared by Deputy McCutchen.[6] Hope also indicated that Feis "had been behaving this way for nearly three years" and that "every time she tries to leave [Feis] he threatens her and takes her car keys and cell phone." CP at 84. Deputy McCutchen relayed Hope's report to Sergeant Steele.
¶ 9 The deputies observed physical evidence corroborating the reports of an assault having taken place. Each of the deputies noted that Feis's car was parked on the lawn *1028 with rutted tire tracks behind its wheels, consistent with the reports of Feis rapidly accelerating his car toward Joshua. Sergeant Steele observed that Joshua's face was slightly red, consistent with a slap, although Deputy McCutchen did not notice any marks on Joshua's face.
¶ 10 Deciding that there was probable cause to arrest Feis for domestic assault and that an arrest was therefore mandatory, Sergeant Steele placed Feis in handcuffs. Because Feis is "exceptionally large," the officers believed that he would not fit in a patrol car. CP at 85. Thus, Deputy Franklin called for a jail van to transport Feis from the scene.
¶ 11 After Feis's arrest, Sergeant Steele further questioned Joshua, pursuant to an established practice of the Department in handling domestic violence incidents. Following the questions included on the King County Sheriff's "Domestic Violence Supplemental Form,"[7] Sergeant Steele asked Joshua a variety of questions. During their conversation, Joshua reported to Sergeant Steele that he lived in the family home, where the incident had occurred, and provided that address as his home address. Joshua also provided the family home telephone number when asked for contact information.
¶ 12 Sergeant Steele also asked Joshua whether Feis had previously assaulted him. Joshua indicated that Feis had assaulted him four or five times previously, but that the assaults had not been formally reported. Joshua told Sergeant Steele that he and Feis had "had problems in the past" and that it "had `been physical' before." CP at 86.
¶ 13 Additionally, pursuant to Department policy, Sergeant Steele asked Joshua if Feis had any firearms and whether Feis had ever used or threatened to use firearms against Joshua. Joshua reported that there were firearms in the house and possibly in Feis's car and that Feis had previously threatened that he could use his firearms to "take care of business." CP at 86. Finally, Sergeant Steele asked Joshua if he would like the deputies to remove the firearms, to which Joshua responded affirmatively. Joshua confirmed the information that he had imparted to Sergeant Steele in a written witness statement.
¶ 14 In her declaration, Sergeant Steele noted that Joshua had conveyed to her that he felt terrified and that both Joshua and Hope were "shaken and afraid." CP at 87. Sergeant Steele further stated that, at the time, she was personally concerned for the safety of Joshua and Hope. Because Joshua had so requested, Sergeant Steele asked Deputy McCutchen to remove the firearms from the Feis residence. Sergeant Steele and Deputy McCutchen both recall that Joshua accompanied Deputy McCutchen into the house.
¶ 15 A search of Feis's vehicle uncovered no firearms. Deputy McCutchen then entered the Feis home, accompanied by Joshua.[8] Joshua directed Deputy McCutchen to a bedroom where the deputy searched for firearms. Deputy McCutchen uncovered four firearms total, one located in a hallway closet and three inside the bedroom, some of which were underneath the mattress of the bed. Deputy McCutchen did not enter any rooms other than the bedroom containing the firearms. The search lasted a few minutes.
¶ 16 Feis was charged with assault in the fourth degreedomestic violence. Hope and Joshua, despite their subpoenas, failed to appear for Feis's trial. The prosecutor was unable to proceed without either necessary *1029 witness and, accordingly, moved to dismiss the case.
¶ 17 Feis thereafter filed a lawsuit against the Department, the arresting officers, and the detective who subsequently investigated the assault.[9] Seeking damages pursuant to 42 U.S.C. § 1983, Feis alleged illegal seizure; illegal arrest; malicious prosecution; illegal entry, search, and seizure; failure to prevent a civil rights violation; false arrest; and false imprisonment. The Department moved to dismiss all of Feis's claims. Feis then filed a counter-motion for partial summary judgment, seeking a judgment that, as a matter of law, the search of his home was unlawful because there was no legal basis for a warrantless search and that the Department was therefore liable. On July 30, 2010, the trial court dismissed all of Feis's claims except the federal search and seizure claim. The trial court accepted supplemental briefing on the remaining issue of the lawfulness of the search and seizure under federal law.
¶ 18 On September 17, 2010, the trial court dismissed with prejudice Feis's claims in their entirety. The trial court ruled that the officers were immune from suit under federal law, explaining that the community caretaking exception to the warrant requirement was sufficiently in flux as to justify a reasonable officer's belief that warrantless entry under the circumstances would not violate Feis's Fourth Amendment rights. Feis appeals.

II
¶ 19 "[C]ourts should think hard, and then think hard again, before turning small cases into large ones." Camreta v. Greene, ___ U.S. ___, 131 S.Ct. 2020, 2032, 179 L.Ed.2d 1118 (2011). Furthermore, "[c]ourts should think carefully before expending `scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will `have no effect on the outcome of the case.'" al-Kidd, 131 S.Ct. at 2080 (quoting Pearson v. Callahan, 555 U.S. 223, 236-37, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Here, we are confronted with an assertion of qualified immunity in response to an alleged violation of a constitutional right that, once sufficiently particularized, was not clearly established beyond debate at the time of the incident in question. Resolution of the issue presentedwhether qualified immunity appliesdoes not require us to opine on the open federal constitutional question debated by the parties.
¶ 20 Entitlement to immunity is a question of law reviewed de novo on appeal. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Qualified immunity is not a mere defense to liability but, rather, is an "entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Accordingly, qualified immunity is a potentially dispositive predicate inquiry, "conceptually distinct from the merits of the plaintiff's claim," where summary judgment is appropriate if the evidence is insufficient to create a genuine issue of material fact regarding whether the defendant committed acts that violated clearly established law. Mitchell, 472 U.S. at 527-28, 105 S.Ct. 2806. To defeat a government official's assertion of qualified immunity, a plaintiff must demonstrate that "at the time of the challenged conduct, `[t]he contours of [a] right [were] sufficiently clear' that every `reasonable official would have understood that what he is doing violates that right.'" al-Kidd, 131 S.Ct. at 2083 (some alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).
¶ 21 The doctrine of qualified immunity strikes a balance between competing policy interests in affording redress for patently unlawful exercises of government power and generally shielding officials who have acted reasonably from the onerous prospect of defending civil litigation. Pearson, 555 U.S. at *1030 231, 129 S.Ct. 808. Reasoning that the public interest is best served by allowing government officials to do their jobs without fear of liability, the doctrine of qualified immunity functions to protect both individual government officials and society as a whole from the costs associated with subjecting public officials to trial. Harlow, 457 U.S. at 816, 102 S.Ct. 2727. Costs borne by society when public officials are compelled to defend litigation include "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S at 816, 102 S.Ct. 2727. In order to avoid such costs, the availability of immunity must be determined at the earliest possible stage in litigation, its value being entirely frustrated when an officer is erroneously compelled to participate in a full trial. Pearson, 555 U.S. at 231-32, 129 S.Ct. 808 (citing Mitchell, 472 U.S. at 526, 105 S.Ct. 2806; Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)): accord Will v. Hallock, 546 U.S. 345, 353, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006) ("The nub of qualified immunity is the need to induce officials to show reasonable initiative when the relevant law is not `clearly established'; a quick resolution of a qualified immunity claim is essential." (citations omitted)).
¶ 22 Government officials performing discretionary functions are entitled to qualified immunity from civil liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. Pearson, 555 U.S. at 231, 129 S.Ct. 808 (quoting Harlow, 457 U.S. at 818, 102 S.Ct. 2727). Enabling such officials to be mistaken and still not be held liable, "[t]he protection of qualified immunity applies regardless of whether the government official's error is `a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 555 U.S. at 231, 129 S.Ct. 808 (quoting Groh v. Ramirez, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J. dissenting)). Hence, qualified immunity protects "`all but the plainly incompetent'" and "`those who knowingly violate the law.'" al-Kidd, 131 S.Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).
¶ 23 Determining entitlement to qualified immunity requires a two-part inquiry, asking (1) whether the facts alleged, taken in the light most favorable to the complaining party, show that an official's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If either question can be answered in the negative, then qualified immunity applies to shield government officials from liability. See Pearson, 555 U.S. at 236, 129 S.Ct. 808.
¶ 24 The United States Supreme Court invited lower courts to exercise their discretion in electing to address initially and conclusively the second prong of the Saucier inquiry in order to find immunity present, thereby obviating a determination on the underlying constitutional question. Pearson, 555 U.S. at 236-41, 129 S.Ct. 808. The D.C. Circuit eloquently explained when that discretion is properly invoked:
Often "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." In such a case, deciding the existence of the constitutional right vel non is "an essentially academic exercise," that "runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality. . . unless such adjudication is unavoidable."
Ali v. Rumsfeld, 649 F.3d 762, 773 (D.C.Cir. 2011) (internal citations and quotation marks omitted) (quoting Pearson, 555 U.S. at 237, 241, 129 S.Ct. 808). Recently, the Supreme Court went beyond its invitation in Pearson and issued a more explicit directive to courts contemplating engaging in a full Saucier analysis. As previously noted, lower courts were cautioned that they "should think carefully before expending `scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will `have no effect on the outcome of the case.'" al-Kidd, 131 S.Ct. at 2080 (quoting Pearson, 555 U.S. at 236-37, *1031 129 S.Ct. 808). We elect to abide by the Court's directive in al-Kidd to forbear resolution of the first prong of the Saucier inquiry, instead focusing our analysis on the existence or nonexistence of a clearly established right under the second prong of the Saucier framework.

III
¶ 25 To defeat an assertion of immunity, a plaintiff must allege that an officer's conduct violated a clearly established and sufficiently particularized statutory or constitutional right. Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). Because allowing plaintiffs to allege violation of "extremely abstract rights" would convert qualified immunity into "virtually unqualified liability," plaintiffs must allege violation of a particularized right, the contours of which are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 639-40, 107 S.Ct. 3034. Imposing liability only where the contours of a right are sufficiently clear ensures that public officials have fair warning of when their conduct may give rise to liability. United States v. Lanier, 520 U.S. 259, 270-71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Furthermore, "too expansive a view of `clearly established law' would risk giving local judicial determinations the effect of rules with de facto national significance, contrary to the normal process of ordered appellate review." al-Kidd, 131 S.Ct. at 2087 (Kennedy, J., concurring).
¶ 26 The Supreme Court has unequivocally demanded, and lower courts have obediently insisted, that plaintiffs seeking to overcome claims of qualified immunity articulate with particularity the clearly established right that they allege to have been violated. E.g., Brosseau v. Haugen, 543 U.S. 194, 200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (framing the particularized right at issue as the Fourth Amendment protection against police shooting a "disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); Mattos v. Agarano, 661 F.3d 433, 448-49 (9th Cir.2011) (holding that the dearth of Supreme Court and Ninth Circuit precedent addressing police officers' use of tasers in dart mode prevented the court from finding a violation of plaintiffs' clearly established right to be free from use of excessive force in the circumstances presented); Fogel v. Collins, 531 F.3d 824, 833 (9th Cir.2008) (characterizing the particularized right at issue as the First Amendment protection enjoyed by an individual in the post-September 11 environment who "satirically proclaim[s] himself or herself to be a terrorist in possession of weapons of mass destruction").
¶ 27 Feis frames the constitutional right at issue in this case as "the fundamental Fourth Amendment guarantee not to have one's home subjected to an `unreasonable' search." Appellant's Br. at 26. The Supreme Court, however, has already disapproved of this level of generality in the articulation of a particularized right: "The general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." al-Kidd, 131 S.Ct. at 2084. Thus, in the present case, the particularized right allegedly violated must be far more specific than simply the right to be free from unreasonable searches and seizures.
¶ 28 Rather, the right at issue here is the right to be free from law enforcement officers entering one's home to seize firearms after a resident of the house has been arrested for a domestic violence assault and the victim, whom officers believe also lives in the home, has requested that the officers remove the firearms from the residence and directed the officers to the location of the firearms. Furthermore, here, the sufficiently particularized right also incorporates the fact that witnesses to the assault, who are family members of both the suspected assailant and the victim, provided corroborating accounts of the assault and implied a history of domestic violence in the household. Only when the right at issue is particularized to this extent can law enforcement officers be expected to determine whether their contemplated conduct violates the suspect's constitutional rights under the circumstances then existing. See Anderson, 483 U.S. at 639-40, 107 S.Ct. *1032 3034. Thus, Feis failed to allege violation of a sufficiently particularized right. In any event, we need not, as aforementioned, consider whether the properly particularized right here at issue was in fact violated, or whether such a right exists today, as we determine that the existence of such a right was not clearly established when the incident occurred.

IV
¶ 29 To overcome a claim of immunity, the right alleged to have been violated by an officer's conduct must have been clearly established at the time of the alleged violation. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Consequently, we must determine whether the particularized right, framed above, was clearly established on March 31, 2007, the date of Deputy McCutchen's entry into Feis's home to search for firearms, such that "every `reasonable official'" would have known that a search under the circumstances presented was unlawful. al-Kidd, 131 S.Ct. at 2083 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). We conclude that it was not.
¶ 30 The applicable test for determining whether such a right is clearly established is both unique in the law and dramatic in its demand. A right is clearly established only where existing precedent has placed the statutory or constitutional question raised by an alleged violation "beyond debate." al-Kidd, 131 S.Ct. at 2083. To determine that a clearly established right exists, "we must be able to point to controlling authorityor a `robust consensus of persuasive authority'that defines the contours of the right in question with a high degree of particularity." Morgan v. Swanson, 659 F.3d 359, 371-72 (5th Cir.2011) (internal quotation marks omitted) (quoting al-Kidd, 131 S.Ct. at 2083). While there need not be factual identity between the present case and that of existing precedent for a right to be clearly established, "there must be some parallel or comparable factual pattern to alert an officer that a series of actions would violate an existing constitutional right." Fogel, 531 F.3d at 833. Indeed, "[t]he sine qua non of the clearly-established inquiry is `fair warning'" to officers of when their conduct will give rise to liability. Morgan, 659 F.3d at 372. Thus, to defeat a claim of immunity, the right at issue must be clearly established, not only among legal practitioners, but among all properly-trained and -informed government officials as well: "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2nd Cir.1999).
¶ 31 Feis contends that Deputy McCutchen's search for firearms violated the Fourth Amendment because the officers did not possess a search warrant and no exception to the warrant requirement applied to justify the search.[10] Conversely, the Department asserts that the community caretaking doctrine justifies the deputies' entry into the Feis home to search for and seize firearms. Because Feis has failed to identify a robust consensus of precedent establishing the unlawfulness of a search under circumstances similar to those confronted by Deputy McCutchen and Sergeant Steele,[11] he has failed to allege violation of a right clearly established beyond debate applicable throughout the United States. The community caretaking doctrine's applicability, or *1033 lack thereof, to warrantless searches of homes in circumstances such as this was not clearly established in 2007; nor is it clearly established today. Additionally, the cases upon which Feis relies in urging the existence of a clearly established right, while definitively incapable of demonstrating a nationwide consensus, do not even establish that the same courts would find a search unlawful when situated in the domestic violence context encountered by the officers here.
¶ 32 At the time of Feis's arrest, the question of whether community caretaking could justify a warrantless entry of Feis's home under the circumstances attendant to this particular type of domestic dispute was not clearly established beyond debate. "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." Morgan, 659 F.3d at 372 (citing Wilson v. Layne, 526 U.S. 603, 617-18, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).[12] Since Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), wherein the Court foreshadowed the current uncertainty regarding community caretaking by discussing the "constitutional difference" between vehicles and houses, the Supreme Court has not elaborated on whether or when the community caretaking exception may justify warrantless entry into a home. Cady, 413 U.S. at 441, 93 S.Ct. 2523; see United States v. Gillespie, 332 F.Supp.2d 923, 929 (W.D.Va.2004).[13] As a result, the federal circuits are not in agreement on the precise contours of the community caretaking exception. See Ray v. Township of Warren, 626 F.3d 170, 175-76 (3rd Cir.2010) ("There is some confusion among the circuits as to whether the community caretaking exception set forth in Cady applies to warrantless searches of the home.").[14] Some federal courts condone resort to the community caretaking exception as an independent justification for a warrantless search of a private residence, while others do not.[15] Because *1034 the extent, scope, and applicability of the community caretaking doctrine itself was not settled at the time of the search of Feis's home, the law was certainly not clearly established such that the deputies' actions here were unlawful beyond debate.
¶ 33 The robust consensus of precedent required to find a right clearly established under the second prong of the Saucier inquiry is a consensus pervading the entire United States, not a single jurisdiction or circuit. See al-Kidd, 131 S.Ct. at 2084. Feis cites to Ninth Circuit case law, specifically United States v. Erickson, 991 F.2d 529, 531-33 (9th Cir.1993), to suggest that the inapplicability of the community caretaking doctrine to the search at issue herein was clearly established in that circuit at the time of the search in question sufficient to give the officers fair notice of the unlawfulness of their conduct. However, in resolving the answer to federal questions, the decisions of the various federal appellate courts, although "entitled to great weight," are not binding upon the Washington Supreme Court or this court. Home Ins. Co. of New York v. N. Pac. Ry. Co., 18 Wash.2d 798, 808, 140 P.2d 507 (1943). "Moreover, the geographical location of the court issuing the opinion is of no moment." S.S. v. Alexander, 143 Wash.App. 75, 92, 177 P.3d 724 (2008). "`We have never held that an opinion from the Ninth Circuit is more or less persuasive than, for example, the Second, Sixth, Seventh, Eighth, or Tenth Circuits.'" Alexander, 143 Wash.App. at 92, 177 P.3d 724 (quoting In re Pers. Restraint of Markel, 154 Wash.2d 262, 271 n. 4, 111 P.3d 249 (2005)). Although the federal district courts in the Ninth Circuit may be bound to follow Ninth Circuit precedent pursuant to the doctrine of stare decisis, this court is not obligated to follow Ninth Circuit precedent, much less are law enforcement officials expected to appreciate the nuances of our judicial hierarchy.
¶ 34 Furthermore, more recent Ninth Circuit precedent casts doubt on Feis's assertion that the court's holding in Erickson unambiguously foreclosed a warrantless search for firearms under the circumstances presented herein. In United States v. Black, 482 F.3d 1035, 1039-40 (9th Cir.2007),[16] the Ninth Circuit concludedalbeit under the auspices of the exigent circumstances and emergency aid doctrinesthat a warrantless entry of an apartment constituted a reasonable "welfare search" for a domestic violence victim whom officers had reason to believe might be inside the apartment. The court discussed the tension between privacy and protection of domestic violence victims in holding the officers' warrantless entry to be justified, noting that the officers would have been criticized had they declined to enter the apartment to search for the victim:
Erring on the side of caution is exactly what we expect of conscientious police officers. . . . We should not second-guess the officers['] objectively reasonable decision in such a case.
Our circuit has recognized that "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." While we have stopped short of holding that "domestic abuse cases create a per se exigent need for warrantless entry," we continue to evaluate, on a case-by-case basis, whether the "total circumstances, presented to the law officer before a search . . . relieved the officer of the customary need for a prior warrant."
Black, 482 F.3d at 1040 (alteration in original and citations omitted). Thus, Feis's reliance on Ninth Circuit precedent to verify a clearly established right at the time of the search at *1035 issue is unavailingnot only because it fails to confirm the national consensus required to verify such a clearly established right, but also because the applicable law is not clearly established even in the Ninth Circuit.
¶ 35 The common law character of our judicial system, operating in tandem with the doctrine of stare decisis, engenders inevitable variation among courts applying federal constitutional law. The doctrine of qualified immunity, as evidenced by the demands of the second prong of the Saucier inquiry, anticipates and responds to this inevitability by precluding officer liability when courts disagree, clarifying that officers are not expected to investigate and apply the varying formulations of each court. Officers expose themselves to liability only when they engage in conduct that defies the clear mandate of controlling authority from the United States Supreme Court or a robust consensus of precedent from courts throughout the United States. al-Kidd, 131 S.Ct. at 2083-84. It is this level of decisional certainty that places a constitutional question beyond debate. See al-Kidd, 131 S.Ct. at 2083-84. Such a robust consensus regarding the particularized right implicated by Deputy McCutchen's search of Feis's home was and remains absent.
¶ 36 Ultimately, we must decide whether a reasonable officer confronted with the circumstances in which Deputy McCutchen and Sergeant Steele found themselves could have believed that a search of Feis's car and home to recover his firearms was lawful. See al-Kidd, 131 S.Ct. at 2083 (An officer violates clearly established law when a particularized right is so clear that "every `reasonable official would have understood that what he is doing violates that right.'" (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034)). In making this determination, we assess the objective reasonableness of the deputies' actions. See, e.g., Anderson, 483 U.S. at 641-42, 107 S.Ct. 3034.[17] Deputy McCutchen and Sergeant Steele were dispatched to the Feis home to respond to a report of domestic violence. Upon arriving at the scene, the officers encountered multiple family-member witnesses who corroborated aspects of one another's statements that Feis had assaulted Joshua. The officers observed physical evidence at the scene consistent with the witnesses' reports, such as the ruts behind the tires of Feis's car and the red mark on Joshua's face. Joshua had fled the scene and was waiting at a church across the street from the Feis home when the officers arrived. The officers observed that Feis was clearly angry with Joshua. Feis voiced his frustration with Joshua's laziness. Hope was crying and otherwise visibly upset, and collapsed shortly after officers arrived. Statements made by the victim and other family members suggested that there was a history of domestic violence in the Feis home.
¶ 37 Joshua repeatedly referred to the Feis residence as his home, giving officers the reasonable impression that he resided at the Feis home at the time of the alleged assault.[18] After Feis was arrested, Joshua requested that officers remove Feis's firearms from the home and directed the officers to the location of the firearms. Sergeant Steele stated that she was concerned for Joshua's safety. Given these factual circumstances and the ambiguity regarding the community caretaking exception as it existed in 2007, a reasonable officer could have believed that entry into the Feis home in order *1036 to comply with Joshua's request that the officers remove his assailant's firearms was justified by the need to render assistance to assure Joshua's safety.
¶ 38 Feis has failed to allege violation of a sufficiently particularized and clearly established right so as to rebut the officers' assertion of qualified immunity. A reasonable, properly-trained and -informed officer confronted with the same circumstances as the deputies in this case would not have known beyond debate that a warrantless search to retrieve firearms violated Feis's Fourth Amendment right. Because the alleged constitutional right to be free of such a search in such circumstances was not clearly established when the conduct occurred, the deputies are entitled to immunity from Feis's federal claims.[19]

V
¶ 39 Feis also contends that the officers are not entitled to immunity under state law. We disagree.
¶ 40 RCW 10.99.070 provides law enforcement officers with immunity from civil liability for good faith conduct stemming from domestic violence incidents:
A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident.
Law enforcement officers are thus immunized from civil liability for conduct "in the course of an arrest or other on-the-scene action such as entering the home to break up a fight." Roy v. City of Everett, 118 Wash.2d 352, 357-58, 823 P.2d 1084 (1992). The on-the-scene search conducted by Deputy McCutchen after Feis's arrest for a domestic violence assault falls within the purview of RCW 10.99.070. The search clearly was an action "arising from an alleged incident of domestic violence," and Feis is clearly a "party to the incident."
¶ 41 The trial court did not err by dismissing Feis's state law claims.
¶ 42 Affirmed.
We concur: APPELWICK and GROSSE, JJ.
NOTES
[1] Feis's federal claim was dismissed on the basis of qualified immunity. Feis's state law claim, as later discussed, was dismissed on the basis of statutory immunity.
[2] In this opinion, we refer to the plaintiff, David Feis, as Feis. We refer to other family members by reference to their first and last names, or first name only, as context dictates.
[3] Although Feis now disputes whether Joshua lived in the Feis home at the time of the incident, the only relevant facts are those known to the officers at the time of the challenged search.
[4] The record reveals limited information as to the extent of the facts relayed to each officer by the dispatcher regarding the precise nature of the domestic violence incident requiring their attention. Sergeant Abigail Steele reports in her declaration that the dispatcher informed her that Mrs. Feis and Joshua had both called 911 to report a physical altercation between Feis and Joshua. The dispatcher further relayed to Sergeant Steele that Joshua had reported that Feis had hit him. Deputy Eric Franklin reports in his declaration that the dispatcher simply told him that "a father and son had been involved in a physical domestic violence incident." CP at 96. Lastly, Deputy Kyle McCutchen's declaration merely reports being dispatched to the scene of a domestic violence incident.
[5] In Joshua's written witness statement, he describes the insults and expletives that he and Feis exchanged, which included Feis referring to Joshua with homophobic slurs, such as "rump ranger." CP at 94. In an interview with Detective Christina Bartlett after the incident, Hope explained that Feis has an "extremely" hard time with Joshua being gay. CP at 117.
[6] In the present litigation, Hope now states that "I did not give any officer a statement of the events nor did I ever sign a statement that I can remember." CP at 255.
[7] The Domestic Violence Supplemental Form used by the Department prompts deputies responding to domestic violence incidents to obtain and record a variety of information. Included on the form are the following categories of information: victim information; victim demeanor; incident; witnesses; children; court order information; firearms/weapons; relationship between victim and suspect; suspect information; victim injuries; suspect injuries; injury diagram; and victim written statement. The questions on the form are designed to direct officers to determine whether the suspect possesses, owns, or has access to firearms; where the suspect's firearms are located; whether the suspect has used, displayed, or threatened to use firearms in the past against the victim or others; and, if firearms are present, whether the victim "want[s] KCSO to remove the firearm(s) now?" CP at 91.
[8] In their declarations, Edward and Feis do not mention Joshua accompanying Deputy McCutchen into the house.
[9] Contrary to their statements at the scene of the incident, Hope and Edward now both testify that Feis's car moved toward Joshua because Feis had forgotten to engage the parking brake when he exited the car. Hope also denies seeing Feis hit or slap Joshua and describes Joshua as the aggressor during the altercation, explaining that she called 911 to prevent Joshua from "having another temper tantrum." CP at 65. Feis, Hope, and Edward deny knowing where Joshua currently lives and deny that he lived at the family home at the time of the incident.
[10] At oral argument, Feis conceded that the search of the hallway closet may have been justified by Joshua's valid consent to a search of that communal area of the home. Joshua could not consent to a search of Feis's bedroom, a noncommunal area.
[11] Feis fails to cite a single case with sufficiently analogous circumstances to those encountered by the deputies in the present case let alone a body of case law clearly establishing the particularized right here at issue. The Supreme Court has made clear that such a paucity of precedent establishing a particularized right prevents a plaintiff from defeating immunity: "Even a district judge's ipse dixit of a holding is not `controlling authority' in any jurisdiction, much less in the entire United States; and his ipse dixit of a footnoted dictum falls far short of what is necessary absent controlling authority: a robust `consensus of cases of persuasive authority.'" al-Kidd, 131 S.Ct. at 2084 (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).
[12] In the context of qualified immunity jurisprudence, where the United States Supreme Court uses the phrase "controlling authority," it is referring to its own decisions and to no others.
[13] In 2000, the State of Washington submitted a petition for writ of certiorari to the United States Supreme Court seeking guidance on the issue of the application of the community caretaking exception outside the context of automobile searches. Petition for Writ of Certiorari, State v. Kinzy, No. 00-679, 2000 WL 34000902 (U.S. Oct. 23, 2000) ("Until this Court addresses this question, the conflicts and confusion among the state and federal courts over this issue will continue."). The Court denied the petition. Washington v. Kinzy, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001).
[14] The Department correctly notes that the Ray decision was issued after the search Feis challenges. Ray, however, helpfully conveys the Third Circuit's present stance on community caretaking and offers an overview of the circuit split regarding the community caretaking doctrine, which predated the search of Feis's home in 2007. See infra note 15. Furthermore, the Ray opinion illustrates the continuing debate concerning the scope and applicability of the community caretaking doctrine.
[15] As Feis emphasizes, the Ninth Circuit once rejected unilateral reliance on community caretaking to justify a warrantless search of a home. United States v. Erickson, 991 F.2d 529, 531-33 (9th Cir.1993) ("The fact that a police officer is performing a community caretaking function . . . cannot itself justify a warrantless search of a private residence."). The Third, Seventh and Tenth Circuits have similarly held that the community caretaking function cannot apply to independently justify warrantless searches of private residences. Ray, 626 F.3d at 177 ("We agree with the conclusion of the Seventh, Ninth, and Tenth Circuits . . . [that] [t]he community caretaking doctrine cannot be used to justify warrantless searches of a home."); United States v. Pichany, 687 F.2d 204, 209 (7th Cir.1982) (reading Cady as expressly confining the community caretaking exception to searches involving automobiles and foreclosing an "expansive construction. . . allowing warrantless searches of private homes or businesses"); and United States v. Bute, 43 F.3d 531, 535 (10th Cir.1994) (agreeing with the line of authority holding that the community caretaking exception is applicable only in cases involving automobile searches).

The Sixth and Eighth Circuits, however, have read Cady to permit reliance on the community caretaking exception to justify warrantless entry into homes, but have imposed additional caveats on the exception, which operate to blend community caretaking with other exceptions to the warrant requirement. Ray, 626 F.3d at 176 (asserting that the circuits relying on the community caretaking exception to uphold warrantless entries into homes have applied "what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role"); see United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir.2006) (upholding warrantless entry of a home under the community caretaking function, but finding that the searching officer possessed a reasonable belief that an emergency existed); United States v. Rohriq, 98 F.3d 1506, 1522-23 (6th Cir.1996) (finding that the governmental interest in "immediately abating an ongoing nuisance" of loud noise in a residential neighborhood was "sufficiently compelling" to justify a warrantless entry into a home when officers' entry was motivated by their community caretaking interest).
[16] The Ninth Circuit's opinion in United States v. Black was filed on October 26, 2006, prior to the search in the present case, but was amended on April 9, 2007, after the disputed search. Amendments to the opinion did not alter the substantive content of the opinion discussed herein.
[17] Elaborating on the opacity of the Fourth Amendment as a reason for giving law enforcement deference in its interpretation and application, the Court in Anderson explained:

[T]he precise content of most of the Constitution's civil-liberties guarantees rests upon an assessment of what accommodation between governmental need and individual freedom is reasonable. . . . We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment. Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law.
483 U.S. at 643-44, 107 S.Ct. 3034 (citation omitted).
[18] Even if the deputies were mistaken as to this fact, such a "mistake of fact," under the circumstances described, would not result in a loss of immunity. Pearson, 555 U.S. at 231, 129 S.Ct. 808.
[19] Feis contends that he is entitled to an award of attorney fees on appeal pursuant to 42 U.S.C. § 1988. Because Feis is not a prevailing party, we deny his request for such an award.