[No. 67628-8-I. Division One. January 7, 2013.]

DAVID R. GALLEGOS, *Appellant*, v. JEREMY FREEMAN ET AL., *Respondents*.

620

*Jeffrey A. Thigpen*, for appellant.

*Michael A. Patterson* and *Sarah E. Spierling Mack* (of *Patterson Buchanan Fobes & Leitch PS*); and *David S. McEachran, Prosecuting Attorney for Whatcom County*, and *Randall J. Watts, Deputy*, for respondents.

¶1 DWYER, J. — Qualified immunity shields a government official from liability for money damages in a lawsuit asserting the violation of a federal civil right unless the plaintiff pleads facts demonstrating that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. A right is "clearly established" only where existing precedent has resolved the statutory or constitutional question beyond debate—the contours of the right must be sufficiently clear that every reasonable official in the circumstances presented would have understood that the official's conduct violated that right.

¶2 In this case, a police officer shot and wounded David Gallegos after Gallegos, whom the officer reasonably believed to be suicidal, failed to obey the officer's commands to stop as he drove his vehicle toward the officer in a darkened field. Gallegos appeals from the trial court's determination that the officer was entitled to qualified immunity on Gallegos's federal constitutional claim of excessive force. However, Gallegos has failed to demonstrate that a reasonable police officer would understand that his or her use of force was clearly unlawful in the circumstances presented. Accordingly, because the particularized right at issue was not "clearly established," the trial court correctly ruled that the police officer was entitled to qualified immunity against this claim. Moreover, even when all of the facts are viewed in the light most favorable to Gallegos, the police officer's use of force was reasonable. Thus, the officer was also entitled to qualified immunity because there was no violation of a constitutional right. Because Gallegos's remaining claims are also without merit, we affirm.

I

¶3 On February 10, 2005, at approximately 7:00 p.m., David Gallegos entered the home of his estranged wife, Emma, in violation of a no-contact order. Gallegos told Emma that he was looking for his firearms. When Emma feigned ignorance as to the whereabouts of the weapons, Gallegos picked up a large kitchen knife. He held the knife against the wall with the point toward his body. Gallegos pushed his body toward the wall and pretended to impale himself on the knife. He then slumped to the floor.

¶4 Gallegos's 16-year-old daughter, who had witnessed this event, telephoned 911. Gallegos, who was not actually injured, quickly left the house and drove away in a red Chevrolet Beretta, still possessing the knife. Emma told the 911 operator that Gallegos was likely driving to his parents' house.

¶5 Whatcom County dispatch thereafter relayed this information to officers in the field. The dispatcher informed officers that Gallegos had violated a no-contact order, that he had attempted to obtain firearms from his wife's residence, and that he was potentially suicidal. The dispatcher indicated that Gallegos had not acquired a firearm at his wife's residence but that he was armed with a knife.

¶6 Deputy Jeremy Freeman and Sergeant Steven Cooley were the first police officers to arrive at the home of Gallegos's parents. Deputy Freeman, a K-9 handler, was accompanied by a police dog. The area was unlit and extremely dark. Deputy Freeman observed several buildings, trees, and a large, open field on the property. The two officers began to talk to Gallegos's brother and father, who were also present on the property.

¶7 Shortly thereafter, Whatcom County dispatch received a second 911 phone call. Skyla McKee, who identified herself as Gallegos's girl friend, indicated that her "boyfriend [was] going to commit suicide." She told the operator that she was located "way back in the field" on Gallegos's parents' property. She reported that Gallegos had a knife and had taken an unknown number of unidentified pills. Gallegos, who could be heard yelling in the background, was threatening to "cut [his] own throat" if law enforcement attempted to intervene. The dispatcher immediately relayed this information to Sergeant Cooley and Deputy Freeman.

¶8 Deputy Freeman thereafter began to scan the field with his flashlight. He determined that the area was a large, open, grassy field. Deputy Freeman also observed a dirt pathway leading toward the back of the field. Having surveyed the area, Deputy Freeman quickly turned off the flashlight so as not to reveal his location to Gallegos.

¶9 Shortly thereafter, Deputy Freeman heard a scream from somewhere in the field. Having been informed by dispatch that there was a person in the field with Gallegos and that Gallegos was armed with a knife and possibly

suicidal, Deputy Freeman was concerned for this person's safety. He entered the field and traveled by foot in the direction of the scream. Sergeant Cooley ordered Gallegos's brother and father to remain behind at the edge of the field and then followed behind Deputy Freeman.

¶10 Deputy Freeman carried his unlit flashlight and dog lead in his left hand while keeping his right hand free. He jogged along the dirt pathway toward the rear of the field where he believed the scream had originated. As he moved up the path, Deputy Freeman heard a car engine revving and observed vehicle headlights in the back of the field. Deputy Freeman believed the vehicle was approximately 200 yards away from him.[1]

¶11 Concerned that the person in the car was using the headlights in order to locate the police officers in the field, Deputy Freeman drew his handgun from its holster with his right hand and held it at a low ready position. Although the dispatcher had informed Deputy Freeman that Gallegos had not acquired any firearms from his wife's residence, given that Gallegos had violated the no-contact order with the objective of obtaining such weapons, Deputy Freeman remained concerned that Gallegos might have a gun.

¶12 As Deputy Freeman resumed his movement toward the rear of the field, he observed the vehicle begin to travel toward him. The vehicle's tires spun and it appeared to fishtail as it accelerated. McKee, who remained on the line with the 911 operator, screamed as Gallegos began to pull away from the back of the field.

¶13 It appeared to Deputy Freeman that the vehicle was traveling directly toward him at a high rate of speed.[2]

---

[1] The vehicle was later determined to have been just over 400 feet from Deputy Freeman's location.

[2] A wide range of estimates was presented to the trial court regarding the speed of the vehicle. Deputy Freeman stated that the vehicle was traveling at a speed of 35 to 40 miles per hour by the time it reached his location. Sergeant Cooley estimated a speed of 35 miles per hour. In contrast, Gallegos's brother, who observed the scene from behind the officers at the edge of the field, estimated that

Deputy Freeman was illuminated by the vehicle's headlights. Although he stepped to the side of the dirt pathway, Deputy Freeman believed that the vehicle continued to turn toward him, adjusting to his movements. McKee told the 911 operator that Gallegos was "coming straight towards them at a very high speed." Just before the vehicle reached Deputy Freeman's location, McKee shouted, "Look out! Look out!"

¶14 As the vehicle approached, Deputy Freeman turned on his flashlight and loudly ordered the driver to stop. He commanded the driver, "Sheriff, canine, stop!"[3] Despite Deputy Freeman's command, the vehicle did not slow down. Believing that he was about to be run over and also fearing for the safety of the persons behind him, Deputy Freeman decided to fire his gun at the driver. He fired three shots.[4] The bullets, which entered the vehicle through driver's side window and door, struck Gallegos in the left hand and upper arm.

¶15 The vehicle then slowed, veered to the left of Deputy Freeman's location, and came to a stop in the field. Gallegos was slumped over the steering wheel and unconscious. Moments later, upon regaining consciousness, Gallegos began to shout at Sergeant Cooley, who was attempting to

the vehicle was traveling at only 10 to 20 miles per hour. Gallegos himself stated that he was driving at 10 miles per hour. An independent investigation of the scene by the Bellingham Police Department determined that the speed of the vehicle was approximately 17 miles per hour at the point where it reached Deputy Freeman's location; however, an investigator from the department testified that this estimate was at "the low end of the scale because [it] assumes no action by the driver of the vehicle to slow the vehicle down other than taking his foot off the gas pedal."

[3] Gallegos contends that he neither saw Deputy Freeman (or any other officer) nor heard a command to stop. He testified at his criminal trial that, just prior to the shooting, he heard a shout to his left, observed a bright light from that location, and was then shot almost immediately. By contrast, Sergeant Cooley stated that he heard Deputy Freeman repeatedly warn Gallegos to stop before the vehicle reached Deputy Freeman's location.

[4] An expert witness for Gallegos determined that Deputy Freeman had fired his weapon from a distance of five to eight feet to the side of the vehicle. The record does not reflect Deputy Freeman's belief regarding his position at the time of the shooting. However, Deputy Freeman stated that he believed the vehicle passed by him at a distance of between one and five feet.

ascertain the extent of Gallegos's injuries. Gallegos told Sergeant Cooley that he knew that it was not Cooley who had shot him because the person who shot him had been accompanied by a dog.[5]

¶16 Gallegos was thereafter charged with burglary in the first degree and violation of a no-contact order based upon the incident in which he entered his wife's residence. He was also charged with assault in the second degree based upon his alleged attempt to hit Deputy Freeman with his vehicle. A jury found Gallegos guilty of burglary in the first degree and violation of the no-contact order and, in addition, returned a special verdict finding that Gallegos was armed with a deadly weapon other than a firearm during the burglary. The jury acquitted Gallegos of assault in the second degree.

¶17 Gallegos thereafter filed a lawsuit pursuant to 42 U.S.C. § 1983, alleging that Deputy Freeman violated his constitutional rights under the Fourth and Fourteenth Amendments by using excessive force to seize Gallegos as he drove out of the field.[6] Gallegos further alleged state law causes of action for negligence and battery.

¶18 On September 25, 2007, Deputy Freeman moved for summary judgment based upon the theory that his actions were reasonable under the circumstances. The trial court denied this motion, finding that there were genuine issues of material fact that precluded summary judgment.

¶19 On May 31, 2011, Deputy Freeman filed a second motion for summary judgment, asserting that he was entitled to qualified immunity from Gallegos's lawsuit. The trial court granted this motion after determining that "[Deputy Freeman's] actions were not unreasonable under the circumstances, and, therefore, he should be granted

---

[5] Gallegos denies making this statement.

[6] The complaint also named Whatcom County and Sergeant Cooley as defendants. Sergeant Cooley was later dismissed from the case by agreement of the parties.

qualified immunity for the actions on that day." The court also dismissed the state law claims against Deputy Freeman, determining that he was entitled to state qualified immunity on those claims.[7]

¶20 Gallegos appeals.

II

¶21 Gallegos first asserts that the trial court erred by determining that Deputy Freeman was entitled to qualified immunity with regard to his federal constitutional claim. He contends that, viewing the facts in the light most favorable to Gallegos, Deputy Freeman's conduct violated Gallegos's constitutional right under the Fourth and Fourteenth Amendments to be free from the use of excessive force and, moreover, that this right was clearly established at the time of the alleged misconduct. We disagree.

¶22 "Qualified immunity is not a mere defense to liability but, rather, is an 'entitlement not to stand trial or face the other burdens of litigation.'" *Feis v. King County Sheriff's Dep't*, 165 Wn. App. 525, 538, 267 P.3d 1022 (2011) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)), *review denied*, 173 Wn.2d 1036 (2012). Qualified immunity "shields an officer from suit when [he or] she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he or] she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004). In the context of an excessive force claim, the doctrine operates "'to protect officers from the sometimes hazy border between excessive and acceptable force.'" *Brosseau*, 543 U.S. at 198 (internal quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed.

---

[7] Gallegos's federal causes of action against Whatcom County were also dismissed by the trial court. The trial court dismissed Gallegos's remaining claim against Whatcom County—a state cause of action for negligence—on August 1, 2011. Gallegos assigns no error to these rulings.

2d 272 (2001)). Because qualified immunity protects officers not just from liability but from suit, " 'it is effectively lost if a case is erroneously permitted to go to trial.' " *Scott v. Harris*, 550 U.S. 372, 376 n.2, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Mitchell*, 472 U.S. at 526). Accordingly, the claim should be resolved at the earliest possible stage in litigation.[8] *Scott*, 550 U.S. at 376 n.2.

■■ ¶23 The determination of a police officer's entitlement to qualified immunity involves a two-part inquiry—we must determine "(1) whether the facts alleged, taken in the light most favorable to the complaining party, show that an [officer's] conduct violated a constitutional right and (2) whether the right was clearly established at the time of the violation." *Feis*, 165 Wn. App. at 539-40 (citing *Saucier*, 533 U.S. at 201). If the answer to either question is "no," then qualified immunity applies to shield the officer from liability for damages. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Although "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," the United States Supreme Court has cautioned courts to "think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.' " *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011) (quoting *Pearson*, 555 U.S. at 236-37). Accordingly, particularly where it is plain that the asserted constitutional right is not clearly established, an officer's entitlement to qualified immunity is best resolved under the second *Saucier* prong.[9] *See Feis*, 165 Wn. App. at 540-41. In evaluating a claim of qualified immunity, we must bear in mind that

---

[8] Entitlement to immunity is a question of law that we review de novo. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994).

[9] Because the trial court's written order states only that the court "finds that Defendant Freeman is entitled to qualified immunity," Gallegos asserts that the

courts "undermine the values qualified immunity seeks to promote . . . when what is not clearly established is held to be so." *al-Kidd*, 131 S. Ct. at 2080.

■ ¶24 As we have previously explained, the test for determining whether a constitutional right is clearly established is "both unique in the law and dramatic in its demand." *Feis*, 165 Wn. App. at 543. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *al-Kidd*, 131 S. Ct. at 2083 (emphasis added). There must exist "controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (internal quotation marks omitted) (quoting *al-Kidd*, 131 S. Ct. at 2083), *cert. denied*, 132 S. Ct. 2740, 183 L. Ed. 2d 614 (2012). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Although it is not necessary that "the very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987), "there must be some parallel or comparable factual pattern to alert an officer that a series of actions would violate an existing constitutional right." *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008).

---

basis for the trial court's ruling is ambiguous. Accordingly, Gallegos purports to address both prongs of the qualified immunity analysis:

> (1) [W]hether Freeman violated a Constitutional right, i.e.[,] whether his use of deadly force was objectively reasonable and (2) whether the law relating to the circumstances that existed was "clearly established" in that a reasonable officer would have known that shooting Gallegos was an unlawful use of deadly force.

Br. of Appellant at 6.

Neither party, however, devotes significant argument to the question of whether Gallegos's asserted right was clearly established in the particular circumstances of this case.

■ ¶25 Courts are "not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084. Instead,

> [t]o defeat an assertion of immunity, a plaintiff must allege that an officer's conduct violated a clearly established and sufficiently particularized statutory or constitutional right. *Saucier*, 533 U.S. at 202 (quoting *Anderson*, 483 U.S. at 640). Because allowing plaintiffs to allege violation of "extremely abstract rights" would convert qualified immunity into "virtually unqualified liability," plaintiffs must allege violation of a particularized right, the contours of which are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 639-40. Imposing liability only where the contours of a right are sufficiently clear ensures that public officials have fair warning of when their conduct may give rise to liability. *United States v. Lanier*, 520 U.S. 259, 270-71, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).

*Feis*, 165 Wn. App. at 541.

■ ¶26 As we have explained, the United States Supreme Court

> has unequivocally demanded, and lower courts have obediently insisted, that plaintiffs seeking to overcome claims of qualified immunity articulate with particularity the clearly established right that they allege to have been violated. *E.g., Brosseau* [, 543 U.S. at 200] (framing the particularized right at issue as the Fourth Amendment protection against police shooting a "disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Mattos v. Agarano*, 661 F.3d 433, 448 (9th Cir. 2011) (holding that the dearth of Supreme Court and Ninth Circuit precedent addressing police officers' use of stun guns in dart mode prevented the court from finding a violation of plaintiffs' clearly established right to be free from use of excessive force in the circumstances presented); *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (characterizing the particularized right at issue as the First Amendment protection enjoyed by an individual in the post-September 11 environment who "satirically

proclaim[s] himself or herself to be a terrorist in possession of weapons of mass destruction").

*Feis*, 165 Wn. App. at 541-42. This requirement of particularization recognizes that " '[t]he *sine qua non* of the clearly-established inquiry is "fair warning" ' to officers of when their conduct will give rise to liability." *Feis*,165 Wn. App. at 544 (alteration in original) (quoting *Morgan*, 659 F.3d at 372). It is the plaintiff's burden to demonstrate that the particularized right that he or she claims was violated was clearly established at the time of the alleged violation. *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

■■ ¶27 As Gallegos correctly points out, claims of excessive force by police officers are judged pursuant to the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). The United States Supreme Court has explained that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). On the other hand, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."[10] *Garner*, 471 U.S. at 11. As the Court has explained, however, because *Graham* and *Garner* "are cast at a high level of generality," these standards do not, except in "an obvious case," provide the fair warning to a police officer that is necessary to defeat a claim of qualified immunity. *Brosseau*, 543 U.S. at 199. Moreover, it is improper for a trial court to deny summary judgment simply because a "material issue of fact remains on the excessive force claim"—even in such circumstances—"[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202.

---

[10] Deputy Freeman concedes that the firing of his weapon at Gallegos constitutes the use of deadly force.

¶28 Here, Gallegos contends that the situation presented is an obvious case in which *Garner* and *Graham* alone provide fair notice:

> Even without the benefit of pre-existing court decisions involving cases factually "on all fours" to the instant case, any reasonable officer would recognize that shooting a driver when he is proceeding at a modest speed and is not presenting a risk of killing or seriously injuring the officer or anyone else would be unlawful, especially when there is no evidence indicating that the driver has earlier committed a violent felony or that he has been threatening the officer or any other person.

Reply Br. of Appellant at 23. However, in so framing the particularized right at issue, Gallegos has seriously mischaracterized the evidence of the circumstances confronting Deputy Freeman.

¶29 In this case, it is undisputed that, prior to his decision to fire his weapon at Gallegos, Deputy Freeman had heard a woman scream from the back of a darkened field. As he jogged toward the source of the scream, Deputy Freeman was aware that Gallegos had violated a no-contact order by entering his wife's residence, that Gallegos had attempted to obtain a firearm from that location, and that Gallegos had armed himself with a knife. Deputy Freeman had also been informed that Gallegos had taken an unknown number of unidentified pills and was potentially suicidal; that Gallegos's girl friend, McKee, was present at the scene; and that Gallegos was extremely agitated and hostile to police intervention. It is likewise undisputed that the vehicle's tires spun as it accelerated, that both McKee and Deputy Freeman believed that the vehicle travelled directly toward Deputy Freeman at a "very high speed," and that Gallegos did not obey Deputy Freeman's commands to stop. Finally, it is undisputed that Sergeant Cooley was following immediately behind Deputy Freeman and that other citizens at the edge of the field remained in the path

of the oncoming vehicle at the time that Deputy Freeman made the decision to fire his sidearm.[11]

¶30 When the evidence of these additional circumstances is considered, it is clear that "[t]he present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 543 U.S. at 199. *Garner* involved circumstances in which a police officer killed a "young, slight, and unarmed" burglary suspect, 471 U.S. at 21, by shooting him "in the back of the head" as he ran from the scene. 471 U.S. at 4. In *Graham*, an officer employed nonlethal force against a diabetic suspect during the course of an investigatory stop. 490 U.S. at 388-89. These cases, of course, have "scant applicability" to the case at hand. *Scott*, 550 U.S. at 383. Rather, it must be determined whether, given the state of the law at the time of Deputy Freeman's actions, it would have been clear to *every* reasonable officer that the use of deadly force was unlawful in the *particular situation* confronting Deputy Freeman. *al-Kidd*, 131 S. Ct. at 2084; *Brosseau*, 543 U.S. at 198-99; *Anderson*, 483 U.S. at 640.

¶31 Neither party has pointed us to "controlling authority" in this matter. In the context of qualified immunity jurisprudence, the phrase "controlling authority" refers to the decisions of the United States Supreme Court and to no others. *Feis*, 165 Wn. App. at 545 n.12. Here, no such decision has involved sufficiently similar circumstances to control the disposition of this case. Accordingly, in order to defeat Deputy Freeman's claim of qualified immunity, "a robust 'consensus of cases of persuasive authority' " must demonstrate that Deputy Freeman's actions were clearly unlawful. *al-Kidd*, 131 S. Ct. at 2084 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)).

---

[11] Moreover, despite Gallegos's assertion that there was no evidence that he had committed a violent felony, Gallegos was in fact convicted of burglary while armed with a deadly weapon.

¶32 Gallegos cites to a single Second Circuit decision in support of this proposition. *See Cowan v. Breen*, 352 F.3d 756 (2d Cir. 2003). In *Cowan*, which involved the fatal shooting of a fleeing motorist, the decedent's estate presented evidence that the vehicle was traveling slowly, that the officer was substantially to the side of the vehicle when he fired his weapon, that the officer gave no warning before shooting, and that the vehicle made no sudden turns as it traveled along the roadway. 352 F.3d at 763. The court determined that, taking these facts as true, the officer could not reasonably have believed that he was in danger of physical harm at the moment the fatal shot was fired and, thus, that no reasonable officer in that position could have believed that the use of deadly force was necessary. *Cowan*, 352 F.3d at 763.

¶33 Gallegos asserts that, having presented evidence that his own vehicle was traveling at a modest rate of speed, that the vehicle never deviated from the dirt pathway, and that Deputy Freeman fired his weapon from a position to the side of the vehicle, the right to be free from deadly force in such circumstances was clearly established. However, as a threshold matter, "[t]he robust consensus of precedent required to find a right clearly established under the second prong of the *Saucier* inquiry is a consensus pervading the entire United States, not a single jurisdiction or circuit." *Feis*, 165 Wn. App. at 547 (citing *al-Kidd*, 131 S. Ct. at 2084). Gallegos's citation to a single, out-of-state decision does not, of course, satisfy this stringent standard.[12]

¶34 Moreover, *Cowan* is factually distinguishable from the present case. In *Cowan*, the police officer and the suspect were the only two persons present in the vicinity of the shooting. 352 F.3d at 758-59. Accordingly, the officer's

---

[12] The Sixth Circuit has also determined that the use of deadly force against a driver is unreasonable where, at the time the officer fires his or her weapon, the vehicle has passed by the officer. *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005). However, the filing of this decision postdates the conduct at issue in this case and, accordingly, could not have given fair notice to Deputy Freeman that his conduct was unlawful. *See Brosseau*, 543 U.S. at 200 n.4.

use of force could be justified, if at all, only by the threat posed to the officer's own safety. *Cowan*, 352 F.3d at 762. By contrast, in this case, Deputy Freeman explained that he decided to fire his weapon at Gallegos, not out of concern solely for his own safety, but also out of concern for the safety of Sergeant Cooley and the other citizens who remained in the path of the vehicle at the edge of the field.

¶35 As discussed above, the United States Supreme Court has held that where the officer has probable cause to believe a suspect poses a threat of serious injury or death to others, the use of deadly force is constitutionally permissible. *Garner*, 471 U.S. at 11; *see also Scott*, 550 U.S. at 386 (holding that an officer is permitted to take actions that place a fleeing motorist at risk of serious injury or death in order to stop the fleeing motorist from endangering the lives of innocent bystanders). In many cases, lower courts have found no Fourth Amendment violation in circumstances wherein an officer shot a fleeing suspect who presented a risk to others. *See, e.g., Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (holding that officer, who fired his weapon at driver of speeding truck, "had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves"); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (noting "a car can be a deadly weapon" and holding that officer's decision to fire his gun through passenger-side window to stop the car from possibly injuring others was reasonable).

¶36 In *Brosseau*, the United States Supreme Court cautioned that this area of law is "one in which the result depends very much on the facts of each case." 543 U.S. at 201. There, a police officer who was engaged in the pursuit of a fleeing suspect observed the suspect enter a parked vehicle. *Brosseau*, 543 U.S. at 196. The officer repeatedly ordered the suspect to exit the vehicle and briefly struggled with him. *Brosseau*, 543 U.S. at 196. When the suspect started the vehicle and began to pull away, the officer shot

him in the back. *Brosseau*, 543 U.S. at 196-97. The officer, who was never in the path of the vehicle, explained that her decision to fire her weapon was based upon her fear " 'for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the suspect's] path and for any other citizens who might be in the area.' " *Brosseau*, 543 U.S. at 197 (some alterations in original) (internal quotation marks omitted) (quoting *Haugen v. Brosseau*, 339 F.3d 857, 865 (9th Cir. 2003)). Under these circumstances, the Court explained, the officer's fear for the safety of others placed her actions within the " 'hazy border between excessive and acceptable force' " and that, accordingly, it was "by no means 'clearly establish[ed]' that [the officer's] conduct violated the Fourth Amendment." *Brosseau*, 543 U.S. at 201.

¶37 Here, Gallegos cites to no state or federal decision that squarely addresses the constitutional question presented in this case: whether an officer's use of deadly force is reasonable where, in pitch black conditions, a suicidal felony suspect drives his vehicle toward the officer (at what is later determined to be modest speed) and fails to obey the officer's commands to stop, and other officers and members of the public remain in the path of the vehicle at the time the officer decides to fire his weapon. Indeed, Gallegos has failed to "cite a single case with sufficiently analogous circumstances to those encountered by [Deputy Freeman] in the present case, let alone a body of case law clearly establishing the particularized right here at issue." *Feis*, 165 Wn. App. at 544 n.11. Accordingly, under the second *Saucier* prong, Deputy Freeman is entitled to qualified immunity against Gallegos's federal constitutional claim.

## III

¶38 Furthermore, in the circumstances presented, Deputy Freeman's use of force was reasonable. Accordingly, because there was no violation of Gallegos's constitutional

right to be free from excessive force, Deputy Freeman is also entitled to qualified immunity under the first *Saucier* prong.

¶39 As noted above, a claim that a police officer has used excessive force is properly "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. A police officer may use deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A reviewing court must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.

¶40 In addition, qualified immunity extends to a government official's "objectively reasonable mistakes, 'regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (quoting *Pearson*, 555 U.S. at 231). "A mistake of fact is an officer's misperception of the circumstances by which he is surrounded." *Southerland v. Pennsylvania*, 389 F. App'x 166, 170 (3d Cir. 2010). "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1032, 181 L. Ed. 2d 739 (2012). Of course, we must determine the reasonableness of an officer's perception of the facts by reference to the facts as they actually existed, which at the summary judgment stage must be taken in the light most favorable to the complaining party. *Saucier*, 533 U.S. at 201. However, "[e]ven if in hindsight the facts show that the [officer] could have escaped unharmed," where a

reasonable officer could have perceived a threat of serious physical harm, the granting of qualified immunity is proper. *Troupe v. Sarasota County*, 419 F.3d 1160, 1168-69 (11th Cir. 2005).[13]

 ¶41 Here, it is undisputed that Deputy Freeman's decision to employ deadly force against Gallegos was based upon his belief that Gallegos posed a threat of serious harm to both to Freeman and to others. The question is whether this belief was objectively reasonable.

¶42 There is no doubt that, considering only Deputy Freeman's perceptions of the circumstances by which he was surrounded, his use of deadly force was reasonable. Deputy Freeman believed that Gallegos was highly agitated and potentially suicidal, that his vehicle was bearing down on Deputy Freeman at a high rate of speed, and that Gallegos had failed to obey his commands to stop the vehicle. Deputy Freeman explained that he was afraid that "the driver had no incentive to stop because he was suicidal, had taken an unknown quantity of some type of pills, and had been threatening to harm himself with a knife." Deputy Freeman believed he had only seconds to act and that if he "did not shoot, [he] would either be killed or seriously injured" by the oncoming vehicle. He stated that he was afraid that even if the vehicle were to hit him, "it would not stop, and would continue down the path where Sergeant Cooley was somewhere behind me, along with others." Under this view of the circumstances, Deputy Freeman had probable cause to believe that both his own life and the lives of others were in danger, thus justifying his decision to employ deadly force against Gallegos.

¶43 The question, then, is whether Deputy Freeman's perception of his surroundings was a reasonable one. With

---

[13] This is consistent with the Supreme Court's admonition that, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments .... [I]t protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

regard to Deputy Freeman's view of Gallegos's mental state, Deputy Freeman had been informed by the dispatcher that Gallegos was potentially suicidal and had been repeatedly threatening to harm himself. It was reasonable for Deputy Freeman to rely upon this information in assessing the threat that Gallegos posed. *See, e.g., Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (determining that immediacy of threat heightened where officer was aware that suspect previously "threatened violence against himself and others"). Similarly, it is undisputed that Gallegos failed to obey Deputy Freeman's commands to stop his vehicle. Although Gallegos contends that he did not hear these commands, the pertinent inquiry is what a reasonable officer in Deputy Freeman's position would have perceived. *Torres*, 648 F.3d at 1124. Because it is undisputed that such commands were given, a reasonable officer would be entitled to consider Gallegos's noncompliance in determining the need to employ deadly force. *See Graham*, 490 U.S. at 396 (explaining that "whether [suspect] is actively resisting arrest or attempting to evade arrest by flight" is relevant to reasonableness of particular use of force).

¶44 At the heart of the dispute are the speed and direction of Gallegos's vehicle as it approached Deputy Freeman. Deputy Freeman testified that he believed the vehicle was traveling at a speed of 35 to 40 miles per hour as it approached his location. However, taking the facts in the light most favorable to Gallegos, as we must where qualified immunity is granted at the summary judgment stage, it must be assumed that the vehicle was traveling at a much slower rate. A forensic investigation by the Bellingham Police Department estimated the vehicle's speed to be only 16 to 17 miles per hour at the time that Deputy Freeman fired his weapon. Gallegos himself estimated his speed at 10 miles per hour, perhaps "a little bit

more or less."[14] Moreover, although Deputy Freeman believed that the vehicle was tracking his movements in the field, it was later determined that Gallegos did not deviate from the dirt pathway. Given Deputy Freeman's mistakes of fact, we must determine whether, given the circumstances in which Deputy Freeman found himself, it was nevertheless reasonable for Deputy Freeman to believe that Gallegos posed a threat of serious harm to Deputy Freeman or to others.

¶45 The answer is yes. Several aspects of the situation confronted by Deputy Freeman indicate the reasonableness of his perceptions. Deputy Freeman heard the vehicle's engine revving loudly before it began to accelerate toward him. The vehicle's tires spun as it pulled away from the back of the field. The field was extremely dark, making it more difficult to judge distances. Moreover, the lights of the vehicle "bounc[ed] up and down" due to the roughness of the path. These factors would make it difficult for a reasonable officer in Deputy Freeman's position to accurately gauge the speed and direction of the vehicle.

¶46 Indeed, Deputy Freeman's impressions were shared by two other witnesses at the scene. Sergeant Cooley estimated the vehicle's speed to be 30 to 35 miles per hour. He believed that Deputy Freeman was directly in the path

---

[14] Deputy Freeman asserts that McKee's description of the speed of Gallegos's vehicle should trump any contradictory evidence presented by other witnesses. He relies upon the United States Supreme Court's decision in *Scott* for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380. However, in *Scott*, the Court had access to a videotape that captured all of the events in question. Because "[t]he videotape quite clearly contradict[ed] the version of the story told by respondent," the Court explained that a court should not rely "on such visible fiction" in determining the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 378, 381.

A 911 recording, however, is not a videotape. Indeed, McKee's descriptions of Gallegos's speed and direction merely reflect her subjective impressions of the events as they unfolded. Accordingly, the rule set forth in *Scott* is inapplicable in this case. Instead, we must view all evidence of the speed and direction of Gallegos's vehicle in the light most favorable to Gallegos. *Saucier*, 533 U.S. at 201.

of the oncoming vehicle, testifying that he saw Deputy Freeman illuminated in the headlights of the vehicle as it moved down the dirt path. McKee, who observed the scene from the back of the field, also believed that Deputy Freeman and Sergeant Cooley were in danger. She told the 911 operator that Gallegos was "coming straight towards them at a very high speed." Just before shots were fired, McKee shouted, "Look out! Look out!" Given the conditions at the scene, and in light of the fact that two other witnesses believed that Gallegos's vehicle was traveling at high speed directly toward Deputy Freeman, it was not unreasonable for Deputy Freeman to also believe that the speed and direction of the vehicle posed a threat of serious injury.

¶47 Because a reasonable officer in Deputy Freeman's position would have perceived a threat of serious physical harm to both himself and to others, see *Troupe*, 419 F.3d at 1168-69, there was no violation of Gallegos's constitutional right under the Fourth and Fourteenth Amendments, and, for this reason as well, the trial court did not err by determining that Deputy Freeman was entitled to qualified immunity.

## IV

¶48 Gallegos next contends that the trial court erred by determining that Deputy Freeman was entitled to state law qualified immunity on Gallegos's claims for assault and negligence.[15] We disagree.

¶49 An officer is entitled to state law qualified immunity where the officer " '(1) carries out a statutory duty, (2) according to procedures dictated to him by statute

---

[15] Deputy Freeman asserts that, because Gallegos failed to address the issue of state qualified immunity in his opening brief, we should not consider the issue on appeal. However, as Gallegos correctly notes, an officer's entitlement to state qualified immunity turns on the reasonableness of the officer's actions—an issue that has been fully addressed by both parties in the context of Gallegos's argument pertaining to federal qualified immunity. Accordingly, the issue has been properly raised.

and superiors, and (3) acts reasonably.'" *McKinney v. City of Tukwila*, 103 Wn. App. 391, 407, 13 P.3d 631 (2000) (internal quotation marks omitted) (quoting *Staats v. Brown*, 139 Wn.2d 757, 778, 991 P.2d 615 (2000)). Here, Gallegos does not dispute that Deputy Freeman was carrying out a statutory duty according to procedures dictated to him by statute and his superiors. Instead, Gallegos asserts only that Deputy Freeman did not act reasonably under the circumstances.

¶50 However, as discussed above, Deputy Freeman's use of force against Gallegos was reasonable. *See* Order, *Arnold v. City of Lakewood*, No. 3:10-cv-05907 RBL, 2012 WL 90472, *7, 2012 U.S. Dist. LEXIS 3398, at *20 (W.D. Wash. Jan. 11, 2012) (holding state qualified immunity applies where officer's use of force was reasonable under Fourth Amendment). Accordingly, the trial court did not err by determining that Deputy Freeman was entitled to qualified immunity on Gallegos's state law claims.

¶51 Affirmed.

GROSSE and BECKER, JJ., concur.

Reconsideration denied February 13, 2013.

Review denied at 178 Wn.2d 1002 (2013).